Suit was commenced 27th July, 1871.
Plaintiff alleged that defendant owed him $876.61, with interest, evidenced by three notes executed by E. J. Pipkin, as agent and guardian of defendant, payable to the plaintiff, *Page 514 
negotiated for the benefit of the defendant and his estate, and paid by the plaintiff.
The answer was filed by E. J. Pipkin, guardian of the defendant, at Fall Term, 1872, in which he alleged that he was appointed guardian of the defendant, Lewis Pipkin, who was adjudged non compos mentis in February; 1872, that he was a son of the defendant, and by general consent of the family, not by any authority derived from his father, he had acted as agent of his father, and as such had executed the notes mentioned in the complaint; his father, at the dates thereof, being insane and unable to transact any business. That the plaintiff had rendered himself liable upon the notes, in consequence of being allowed to take possession of the 16 bales of cotton, weighing 8,112 pounds, the property of Lewis Pipkin, worth $1,216, and judgment for that amount is asked against the plaintiff.
The replication admits that Lewis Pipkin was declared a lunatic in February, 1872, and was so reputed, but denies the allegation in the answer in reference to the 16 bales of cotton, and reitterates [reiterates] that the plaintiff merely indorsed the notes for the benefit of the defendant at the instance and upon the certificate of his friends, E. J. Pipkin included; that the family of the defendant was in a necessitous condition, and by way of loan for the purpose of procuring necessaries supplied to defendant.
For the plaintiff, the following three notes were offered in evidence:
"$325. Ninety days after date, I promise to pay to W.B. Surles, three hundred and twenty-five dollars, value received, negotiable and payable at the banking house of A.W. Steel Co., in Faytteville [Fayetteville], this amount being for the benefit of the family of Lewis Pipkin.
 March 17, 1871. (Signed) "E.J. PIPKIN, Acting Agent. Indorsed: W. B. SURLES." *Page 515 
"MARCH 21, 1871.
"$292.61. Ninety days after date, I promise to pay to the order of W. B. Surles, two hundred and ninety-two dollars and sixty-one cents, at the banking house of A.W. Steele Co., value received.
 (Signed) "E. J. PIPKIN, Agent Lewis Pipkin. Indorsed: "W. B. SURLES." "FAYETTEVILLE, April 4, 1871.
"Ninety days after date, I promise to pay to William B. Surles, or order, two hundred and fifty dollars, value received, negotiable and payable at the banking house of A. W. Steel Co., in Fayetteville, this amount being for the benefit of the family of Lewis Pipkin.
(Signed) "E. J. PIPKIN, Agent Lewis Pipkin.
Not indorsed.
The plaintiff testified that the above three notes were negotiated at the banking house of A. W. Steele Co., and I paid them. I had agreed to endorse to the amount of $1,000, in consequence of statements contained in this certificate signed by three sons and two sons-in-law of Lewis Pipkin.
 "STATE OF NORTH CAROLINA, HARNETT COUNTY.
"Know all men by these presents, that we, E. J. Pipkin, agent, John W. Pipkin, Samuel D. Pipkin, John Brantley, W. H. Johnson, do certify that it is necessary for E. J. Pipkin to have for the benefit of the estate of Lewis Pipkin $1,000, and we agree to endorse his act, as agent, to that amount, and William B. Surles agrees to endorse for the above amount.
 (Signed) E. J. PIPKIN, J. W. PIPKIN, JOHN BRANTLEY, S.D. PIPKIN, W. H. JOHNSON. This March 17, 1871. *Page 516 
I (the plaintiff,) endorsed the note (No. 1,) for $325 on the day of the date of this certificate. I also endorsed the note (No. 2,) for $292.61, and I made myself liable for the note (No. 3,) for $250, which was negotiated upon this letter of credit, pinned to the note, and which was returned to me when I took up the note:
"LITTLE RIVER, April 3, 1871.
MR. A. W. STEELE: —
Dear Sir: Mr. Pipkin is on his way to Fayetteville to get some more of the one thousand dollars agreed on when we were down. You can make the arrangement with him for $250, and take his note as the other is taken. You will please look at the first note, and draw this one by it, and I will be down this week, and will endorse it.
 Yours truly, (Signed) W. B. SURLES."
I indorsed two of the notes, made myself liable for the third, and paid the whole.
Lewis Pipkin was lunatic in 1871.
Cross-examined: E. J. Pipkin, John W. Pipkin and John Brantley, under the firm of Brantley Pipkin, cultivated the lands of Lewis Pipkin in 1870. They likewise cultivated the same year, land of Col. A. S. McNeill. I made advances of money to them to enable them to raise that crop, and there were, in payment of advances, 65 bales of cotton delivered to me. At the time these 65 bales were delivered to me, a portion of the crop was still ungathered, or unginned, which subsequently made 16 bales. These 16 bales were claimed to be withheld by E. J. Pipkin, as rent due Lewis Pipkin, and John W. Pipkin refused to surrender them, E. J. Pipkin, saying that as agent of his father, he contended for these 16 bales as rent of his father's land, due from Brantley Pipkin. *Page 517 
Here the articles of agreement, made between W. B. Surles and Brantley 
Pipkin, dated the 11th of January, 1870, were read in evidence by the plaintiff. It is therein stipulated that W. B. Surles was to furnish as called for, $3,000, to enable Brantley Pipkin to plant and cultivate 150 acres in cotton in the year 1870. Brantley Pipkin were to cultivate that quantity of land in cotton, and deliver the cotton to that value of W. B. Surles; he to do the ginning for the toll of one-fifteenth and the seed. In default of delivering the cotton, they were to deliver ten mules to meet the indebtedness, which was to be settled by the 1st of January, 1871. A lien was also given to the full extent of the crop. Performance on both sides was secured in a penalty of $6,000.
W. B. Surles' direct examination resumed: Under the articles of agreement, I advanced to Brantley Pipkin, between $4,200, and $4,400; and then assigned my interest in the contract to J. A. Pemberton, who paid me for my advances, and who made further advances to the firm. W. D. Smith also made advances to the firm in fertilizers. The aggregate value of the advances made by myself, Pemberton and Smith, was between $6,800, and $7,000.
In 1871, the farm was carried on by E. J. Pipkin for the benefit of the estate of his father. John W. Pipkin was not concerned in the management that year. When they refused to surrender the sixteen bales of cotton, I went to Harnett court-house, in behalf of J. A. Pemberton, to institute legal proceedings for the recovery of the cotton. While the bond for claim and delivery was being filled up, I mentioned to John W. Pipkin, that I had offered to his brother, E. J. Pipkin, to indorse to the amount of $1,000, for the benefit of the estate, to enable them to start a crop, and that then they could get along by mortgaging the crop. He asked if I would do that still, and upon my assenting, he assured me the sixteen bales would be given up to Pemberton by E. J. Pipkin. *Page 518 
The sixteen bales were accordingly given up, and went like the sixty-five bales, towards paying the advances made by myself, Pemberton and Smith. The sixteen bales weighed 8,074 lbs., and brought barely thirteen cents per pound. No part of the cotton received was intended to be applied to the payment of the notes in suit. These notes I indorsed, to assist them in getting stock, provisions, c., to cultivate the crop of 1871, as they said they had no horses or provisions. The sixteen bales have been applied to the general account of 1870.
John Brantley, witness for the plaintiff, testified: I married a daughter of Lewis Pipkin. Upon my application in 1872, he was declared a lunatic, and his son, E. J. Pipkin, was appointed his guardian.
In 1871, Lewis Pipkin had no means of support, except his land. He had no money, nor provisions, nor horses, nor mules — nothing but household furniture. He needed immediate pecuniary assistance, and some arrangement had to be made.
On the 10th of January, 1871, E. J. Pipkin put up his father's land to rent, and tried to raise means upon the notes taken to secure the rent, but failed, because the notes were not considered regular. W. B. Surles agreed to assist him, provided the papers could show that the advances were for the benefit of the family. That is why we all signed the certificate to the effect.
When Surles was about to take legal proceedings to get the sixteen bales of cotton, he entered into an arrangement, by which he agreed to indorse to the amount of $1,000, if the notes could be so drawn as to bind Lewis Pipkin's property, and John W. Pipkin agreed that E. J. Pipkin should unlock the gin house, and let me and Surles take the cotton away to pay off the debts of Pipkin Brantley. I had come with some wagons for the cotton, but they would not let me have it, and locked it up. This arrangement was *Page 519 
made about the 17th of March, 1871. E. J. Pipkin got money for the Surles' notes, and bought some mules and provisions, and carried on a crop that year for the benefit of his father's family, which consisted of Lewis Pipkin and wife, two daughters, two infant orphans, and John W. Pipkin and E. J. Pipkin.
Cross examined by defendant's counsel: The firm of Brantley Pipkin farmed on the land of Lewis Pipkin in 1870. They were to pay two and a halfper cent. per month for the use of the advances made by W. B. Surles. We raised in all, about eighty-one bales of cotton, including some fifteen or twenty bales raised on McNeill's land. About sixty-five bales were estimated to have been raised on the land of Lewis Pipkin. It was about the close of the year 1869, that Brantley Pipkin agreed with E. J. Pipkin to rent the land of Lewis Pipkin for the year 1870. The rent was not to be a part of the crop, but was payable in money, the amount to be estimated by three gentlemen: Messrs. McNeill, Murchison and Adams. In the first three months of 1870, Brantley Pipkin paid before it was due, between $500 and $600. E. J. Pipkin received $110 as the first payment, and used it in repairing the house of his father. When Brantley Pipkin rented the land, Lewis Pipkin had some fodder on hand. They plowed a mule of his. A couple of hired men lived at Lewis Pipkin's. W. B. Surles did not indorse to the full extent of $1,000, in consequence of a difficulty between him and E. J. Pipkin. Three or four teams were used in hauling off the sixteen bales.
Direct examination resumed by plaintiff: The improvements put upon the land of Lewis Pipkin in 1870, by Brantley Pipkin, were worth $1,500. About the 10th of March, 1871, the question as to the amount of the rent to be paid by them was decided to be about $700 or $800 in money. The 16 bales of cotton was then being ginned at the ginhouse. About the beginning of March, I first heard *Page 520 
of the 16 bales being claimed as rent. They were not set apart by Brantley Pipkin; when they were given up they were hauled to Fayetteville and delivered to A. W. Steele Co., under an arrangement of J. A. Pemberton. When the $800 valuation of rent was decided, E. J. Pipkin remarked that that amount had already been paid.
Lewis Pipkin's corn gave out about February, 1870. We kept the family up for nearly a year. Brantley Pipkin still owe a small balance on their indebtedness to W.B. Surles. Eight of my mules and a wagon, together with the mules of John W. Pipkin, went to pay this debt. E.J. Pipkin had nothing.
The evidence being closed on the part of the plaintiff, the defendant's counsel asked his Honor to instruct the jury that the plaintiff, upon his own showing, was not in law entitled to a verdict against Lewis Pipkin, for the reason that E. J. Pipkin had no authority in 1871, to sign notes binding upon Lewis Pipkin, at that time a lunatic — the notes not being for necessaries, and he not having been appointed guardian until February, 1872.
His Honor gave the instructions as asked for by defendant's counsel, and remarked to the jury that if such transactions respecting the estates of lunatics as the evidence disclosed, by mere volunteers, were held valid by the Courts, the provisions of law for the protection of lunatics would be rendered nugatory. To this charge plaintiff excepted.
A verdict was rendered for defendant. Rule for a new trial, granted and discharged. Judgment against the plaintiff for costs. Appeal by plaintiff.
The plaintiff sues on a money demand of *Page 521 
$867.61, evidenced by three notes set out in the record. These notes were signed by E. J. Pipkin, a son of the defendant, who represented himself as the agent of his father, who was a lunatic. The condition of the defendant was known to the plaintiff, for he states in his evidence that the defendant was a lunatic in 1870, and the arrangement he made in regard to endorsing the notes, shows that he knew that the defendant was not only of unsound mind, but without a guardian.
Under these circumstances, the endorsed notes for the purpose of enabling the son, E. J. Pipkin, to raise money, as the plaintiff says, for the benefit of the estate.
The plaintiff and E. J. Pipkin volunteered to benefit the estate of the defendant by running a farm, and borrowed money at 2 1/2 per cent. per month for that purpose. The lunatic may well wish to be saved from his friends.
The plaintiff does not render necessary services, nor furnish necessary articles for the support of the defendant, but simply enables the self-constituted agent to borrow money on the credit of the defendant.
He does not see to the application of this money, a part of which appears to have been expended in setting up the self-constituted agent as a farmer. The position that a promise will be implied, to pay for necessary services rendered, and necessary articles furnished to a lunatic, is well established. The leading case in England on this point is Baxter v. Earl ofPortsmouth, 12 E. C. L. R. 79, and in this State, Richardson v. Strong, 13 Ired. 106, but all of the cases go upon the idea that the lunatic had the actual use and benefit of such services and articles.
We were much inclined to sustain the ruling of his Honor, for the plaintiff and E. J. Pipkin were both mere volunteers, and after an inspection of the whole record sent to this Court, it may well be doubted whether the son and guardian is not himself a fit subject for guardianship; but *Page 522 
as the defendant may have received some necessary support from this money, it should have been left to the jury to find how that fact was.
The plaintiff can only recover so much of his debt as he can show was actually expended for the necessary support of the defendant, and such of his family as were properly chargeable upon him. Upon the inquiry before the jury the defendant will also have an opportunity of establishing his counterclaim.
PER CURIAM. Venire de novo.